Argued and submitted October 10, 1990, the decision of the Court of Appeals affirmed in part and reversed in part; case remanded to the Court of Appeals for further proceedings October 10, 1991
See 112 Or App 153, 826 P2d 130 (1992)

In the Matter of
Ryan James Green and
Rachael Sarah Kasper, Children,

## STATE ex rel JUVENILE DEPARTMENT OF LINCOLN COUNTY
and Children's Services Division,
*Respondents on Review,*

*v.*

Tammy ASHLEY,
*Petitioner on Review.*

(CC 86-0195; CA A61020; SC S37156)

818 P2d 1270

Michele Longo Eder, of Longo Eder & Lovejoy, Lincoln City, argued the cause and filed the petition for petitioner on review.

John Reuling, Assistant Attorney General, Salem, argued the cause and filed the response to the petition for respondents on review. With him on the response were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Michael C. Livingston, Assistant Attorney General, Salem.

GRABER, J.

## GRABER, J.

The principal issue in this case is whether the statutory psychotherapist-patient privilege applies to communications made during drug counseling. We conclude that the privilege does not apply. For the reasons discussed below, we reverse in part and remand the case to the Court of Appeals for further proceedings.

The state initiated a petition to terminate the parental rights of mother. ORS 419.523 (1987).[1] At the time of the hearing, on May 10, 1989, mother was incarcerated on forgery convictions. Mother admitted that she is dependent on controlled substances, but she testified that she had not used drugs while incarcerated, that she had participated while incarcerated in what she referred to as "Christian counseling," and that she was committed to remaining drug-free. She said that, when released, she would seek treatment from Teen Challenge, a residential drug treatment program. Mother did not deny that her drug dependency had made her unfit as a parent before her incarceration.

In response, the state argued that mother's short-term abstinence in a highly structured prison environment did not show that she would remain drug-free after her release. The state attempted to introduce evidence about mother's prior, unsuccessful counseling for drug dependency in 1986 and 1987. Specifically, the state sought to introduce mother's drug counseling records and testimony of two of her former drug counselors. Mother objected, asserting that that evidence was inadmissible under OEC 504. OEC 504 reads, in part:

---

[1] ORS 419.523 (1987) provided in part:

"(1) The parental rights of the parents of a child within the jurisdiction of the juvenile court * * * may be terminated as provided in this section and ORS 419.525. * * *

"(2) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change."

That statute was amended by Oregon Laws 1989, chapter 907, section 2, in a manner not relevant to this case.

"(2) A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purposes of diagnosis or treatment of the patient's mental or emotional condition among the patient, the patient's psychotherapist or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family."

OEC 504(1)(c) defines "psychotherapist" as a person who is:

"(A)  Licensed, registered, certified or otherwise authorized under the laws of any state to engage in the diagnosis or treatment of a mental or emotional condition; or

"(B)  Reasonably believed by the patient so to be, while so engaged."[2]

The trial court excluded the evidence on the basis of OEC 504. At the end of the hearing, the trial court concluded that:

"[Mother] was unfit as a parent by reason of conduct and conditions seriously detrimental to the children up until the time she entered prison in December 1988. However, this court specifically concludes that the state has failed to prove by clear and convincing evidence that such unfitness has not terminated, nor has it proved that it is improbable that the children can be integrated into the home of the parent in the *foreseeable future* due to conduct or conditions not likely to change." (Emphasis in original.)

The trial court, therefore, dismissed the state's petition to terminate mother's parental rights.

The state appealed. It argued, *inter alia*, that the trial court erred, because the legislature intended to exclude drug counseling from the privilege. The Court of Appeals held that the psychotherapist-patient privilege does not encompass drug counseling. The court's reasoning was twofold. First, OEC 504, which was based on *proposed* FRE 504,[3]

---

[2] The state argued at trial that mother failed to show that her former drug counselors were "authorized under the laws of any state" to provide treatment. In other words, according to the state, mother failed to show that the drug counselors were psychotherapists under OEC 504(1)(c)(A). Even if the state is correct about the credentials of mother's drug counselors, however, the record demonstrates that mother reasonably believed that they possessed the requisite qualifications. OEC 504(1)(c)(B).

[3] *Proposed* FRE 504 was never enacted. According to one commentator:

deleted the part of the federal version that expressly included drug counseling. Second, the Court of Appeals found this passage in the legislative commentary to OEC 504 to be persuasive:

"The Legislative Assembly intends to exclude, from the definition of 'psychotherapist,' a person who is specifically consulted for a problem of drug and alcohol dependency."

*State ex rel Juv. Dept. v. Ashley,* 101 Or App 268, 271, 790 P2d 547 (1990).

The Court of Appeals then considered mother's argument that, even if the privilege does not apply, exclusion of the evidence was harmless error. The court disagreed, reasoning that "the excluded evidence could contain information crucial to" determining whether mother "is capable of recovering from her dependency in the foreseeable future, which would allow the reintegration of her children into her home." *State ex rel Juv. Dept. v. Ashley, supra,* 101 Or App at 272. The court reversed the judgment of the circuit court and remanded the case. *Ibid.*

On review, mother disputes both the Court of Appeals' reading of OEC 504 and its disposition of the case. We will consider each of those issues in turn.

With respect to the psychotherapist-patient privilege, mother argues that the Court of Appeals misinterpreted OEC 504. She challenges in particular the court's reliance on the legislative commentary, which, she contends, does not accurately reflect the intent of the legislature.

As a threshold matter, we observe that the Oregon Evidence Code applies generally to all actions, suits, and proceedings in circuit courts. OEC 101(2). OEC 503 and OEC 504, relating to privileges, apply at all stages of all such actions, suits, and proceedings. OEC 101(3). A proceeding to terminate parental rights, ORS 419.525, is a proceeding within the meaning of the Code. *See State ex rel Juv. Dept. v.*

---

"The rules of privilege adopted by the United States Supreme Court as part of the Federal Rules of Evidence generated so much opposition and controversy in Congress that Congress ultimately deleted them to avoid further delay in the passage of the federal rules." Kirkpatrick, *Reforming Evidence Law in Oregon,* 59 Or L Rev 43, 69-70 (1980) (footnote omitted).

*Martin,* 271 Or 603, 605, 533 P2d 780 (1975) (psychiatrist-patient privilege, then provided by ORS 44.040(1)(d) and (2), applied in proceeding to terminate parental rights). OEC 504 applies, then, to this case.

In interpreting OEC 504, our task is to discern the intent of the legislature. ORS 174.020. We begin with the words of the statute. ORS 174.010; *Whipple v. Howser,* 291 Or 475, 479, 632 P2d 782 (1981).

The pertinent passages in OEC 504(1)(c) and (2) provide that the privilege applies to diagnosis or treatment of a "mental or emotional condition." The phrase "mental or emotional condition" neither unambiguously includes nor unambiguously excludes drug dependency. "Mental or emotional condition" may mean quite different things to a psychiatrist, a psychologist, an internist, a research physician, a social worker, a patient, a member of the clergy, a legislator, and a judge.[4] *Cf. Mattiza v. Foster,* 311 Or 1, 4, 803 P2d 723 (1991) (the term "bad faith" is not self-explanatory). The

---

[4] Psychiatrists themselves disagree about what constitutes a "mental condition" or whether that concept has any validity at all. *See* Brooks, Law, Psychiatry and the Mental Health System 21-89 (1974) (compilation of psychiatry scholars' essays discussing differing concepts of mental illness). The drafters of *proposed* FRE 504 expressly included the words "drug addiction" in apparent recognition of the ambiguity of the general phrase, "mental or emotional condition."

Chemical dependency is considered by some to be a physical, rather than a mental or emotional, condition. One recent scholarly article points out that drug dependence "involves the physiological as well as the psychological."

"[W]hen methadone programs originally came into existence, they were based on a *medical* model which took metabolic changes after addiction to be central. This model was developed by Dole and Nyswander (Dole 1970) * * *. In terms of this model, the craving for opiates is seen as physiologically based, permanent, and subject to correction only by the administration of another opiate such as methadone (Dole 1970). * * *

"While this early medical model is conservative, * * * it promotes the belief that addiction no longer need be seen as symptomatic of underlying psychological problems [citations omitted]." Covington, *Addict Attitudes Toward Legalization of Heroin,* 14 Contemp Drug Probs 315, 323 (1987).

Methadone remains an acceptable treatment for heroin addiction. Rosenbaum, Irwin and Murphy, *De Facto Destablization as Policy: The Impact of Short-Term Methadone Maintenance,* 15 Contemp Drug Probs 491 (1988).

The August-September 1991 edition of the Oregon State Bar Bulletin is devoted to the topic of "Drugs, Alcohol & Lawyers." A physician whose practice is limited to treatment of chemical dependency writes that the most productive area of research concerns the role of brain chemistry. Chemical dependency is most influenced, he states, by how the addictive substance "affects the reward centers in the brain." Jacobsen, *Puzzled by Addiction?,* 51 OSB Bulletin 21, 22 (Aug-Sept 1991).

intent of the legislature is not clear from the terms and context of the statute. We turn, therefore, to legislative history.

The Advisory Committee on the Oregon Evidence Code (Advisory Committee) proposed a version of OEC 504 that defined "mental or emotional condition" expressly to include "drug addiction":

> "A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications in a civil action, suit or proceeding, made for the purposes of diagnosis or treatment of the patient's mental, physical or emotional condition, *including drug addiction,* among the patient, the patient's psychotherapist, regular physician or surgeon or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist or regular physician or surgeon." Proposed OEC Report, Interim Committee on the Judiciary, December 1980, p 76 ("Proposed OEC Report") (emphasis added).

The proposed definitions of psychotherapist and physician likewise expressly included certain persons diagnosing or treating "drug addiction":

> "(c) 'Psychotherapist' means:
>
> "(A) A person authorized to practice medicine in any state or nation, or reasonably believed by the patients so to be, while engaged in the diagnosis or treatment of a mental or emotional condition, *including drug addiction*; or
>
> "(B) A person licensed or certified as a psychologist under the laws of any state or nation, while similarly engaged.
>
> "(d) 'Regular physician or surgeon' means a person authorized and licensed or certified to practice medicine in any state or nation, or reasonably believed by the patients so to be, while engaged in the diagnosis or treatment of a mental, emotional or physical condition, *including drug addiction*." *Id.* at 76 (emphasis added).

The Advisory Committee's commentary stated that the committee included drug addiction to encourage drug-dependent persons to seek assistance. *Id.* at 78. The Advisory Committee had based its version of the privilege on *proposed* FRE 504. *Id.* at 77. *Proposed* FRE 504 expressly included drug addiction as a mental or emotional condition:

"A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications, made for the purposes of diagnosis or treatment of his mental or emotional condition, *including drug treatment,* among himself, his psychotherapist or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family." *Proposed* FRE 504 (emphasis added).

Psychotherapist was defined as:

"[A] person authorized to practice medicine in any state or nation, or reasonably believed by the patient so to be, while engaged in the diagnosis or treatment of a mental or emotional condition, *including drug addiction*[.]" *Proposed* FRE 504(a)(2) (emphasis added).

When the Interim Joint Committee on the Judiciary (Interim Committee) designed its proposed rule, however, it deleted drug addiction from both the rule and the commentary. Proposed OEC Report, *supra,* at 75-76. The Interim Committee made the change in response to a concern raised by then-Circuit Court Judge Robert E. Jones. He stated that, in his experience, federally funded programs for drug addicts would not provide status reports on probationers to the courts, because of federal confidentiality rules. As a result, judges could not monitor probationers to see that they were observing the conditions of their probation. He did not want a state privilege similarly to prevent courts from obtaining valuable, and otherwise available, information about people on probation. The Interim Committee decided that it did not want to extend the psychotherapist-patient privilege to treatment for drug addiction. Representative Frohnmayer moved to omit the words "including drug addiction" from the general rule of privilege, OEC 504(2), and from the definition of psychotherapist, OEC 504(1)(c)(A). He stated that deleting the passages about drug counseling would show the intent of the Interim Committee and force the legislature to make an affirmative change if it wanted to include drug dependency under the protection of the privilege. Hearing no objection, the Chair ordered that that material be deleted. Minutes, Interim Joint Committee on the Judiciary, Subcommittee on Evidence, May 27, 1980, pp 17-18.

The proposed evidence code was submitted to the 1981 Legislative Assembly as House Bill 2030. The Interim

Committee, whose work we have described above, had been formed by the 1979 Legislative Assembly. Accordingly, its intentions cannot be imputed automatically to the 1981 Legislative Assembly. Nonetheless, in this instance, three factors make the background of OEC 504 in the Interim Committee relevant to discerning the intent of the 1981 legislature. First, the membership of the Interim Committee and the 1981 substantive committees that considered HB 2030 overlapped. The House Committee on the Judiciary and Senate Justice Committee considered the proposed psychotherapist-patient privilege during the 1981 session. Each of those committees had three members who had served on the Interim Joint Committee on the Judiciary. Second, each of the substantive committees discussed OEC 504, including the issue of drug dependency, explicitly during the 1981 session, as we will describe more fully below. Third, the materials before both substantive committees contained as exhibits the Advisory Committee's version of OEC 504, with the references to "drug addiction," and the Interim Committee's version, without them. House Committee on the Judiciary, HB 2030, Exhibit VV; Senate Justice Committee, HB 2030, Exhibit A. *See, e.g., State v. Stockfleth,* 311 Or 40, 50, 804 P2d 471 (1991) (turning to workings of interim committee for guidance on legislative intent); *Charmley v. Lewis,* 302 Or 324, 328-29, 729 P2d 567 (1986) (analyzing legislative intent by tracing origins of Oregon Evidence Code from advisory committee through the legislature); *State v. DeMello,* 300 Or 590, 597-600, 716 P2d 732 (1986) (relying on interim committee commentary and testimony by interim committee member before Senate committee in interpreting provision of Oregon Vehicle Code).

The House Committee on the Judiciary discussed OEC 504 in its work session on July 2, 1981. Staff counsel to the committee presented a memorandum from the Mental Health Division asking to include drug and alcohol dependency as mental or emotional conditions in OEC 504. Exhibit WW, HB 2030. Counsel said that, in response to the memorandum, he had written in the commentary that the Legislative Assembly intended to include chemical dependency.

Judge Jones shared the concern that he had previously expressed to the Interim Committee. After his

testimony, the Chair of the House Committee on the Judiciary stated that he would oppose the inclusion of drug and alcohol dependency in OEC 504. Staff counsel was instructed to rewrite the commentary to state that the legislature intended to exclude from the definition of "psychotherapist" a person who is consulted specifically for drug or alcohol dependency. Minutes, House Committee on the Judiciary, Subcommittee 1, July 2, 1981, p 7. The commentary was so written.

On July 29, 1981, the Senate Justice Committee discussed the same issue. A representative of the Metropolitan Public Defender's office (MPD) testified in favor of amending OEC 504 *or* the commentary to include drug and alcohol counseling. A member of the committee moved to include them. Another member said that he would not support their inclusion. He reasoned:

> "We are very, very concerned that in fact with drugs and alcohol related problems, in which I understand the vast bulk of crimes are committed, * * * the person is either under the influence of drugs or alcohol. * * * I would be very concerned that we would be undermining the ability of the police authority to get into those issues * * * I have real reservations about doing anything at this particular time that hinders the police."

Another member agreed and summarized Judge Jones' testimony to the Interim Committee. According to this committee member, Judge Jones had warned that judges would not be willing to put people with chemical dependency on probation if the judges could not monitor compliance with conditions of probation through drug counseling status reports.

Staff counsel to the Senate Justice Committee asked how one could, as a practical matter, separate drug problems from mental or emotional problems. The Chair of the Senate Justice Committee agreed that it could be difficult. Some members of the committee were unsure whether a patient's communications about drug use, made during treatment for *other* mental or emotional problems, would be privileged. Some expressed concern that a distinction between programs denominated drug treatment and other kinds of therapy would be unworkable. The MPD representative stated that the committee's greatest concern — that the inclusion of drug

counseling in the privilege would undermine law enforcement — was unfounded. In his experience with criminal trials, he said, the state did not call drug counselors as witnesses to discuss the defendants' communications. A committee member observed that, if that were true, then MPD was arguing "a non-issue." The MPD representative agreed with him and also noted that, in therapy, drug problems would be difficult to separate from emotional or mental problems. The MPD representative withdrew his proposed amendment. Tape Recording, Senate Justice Committee, July 29, 1981, Tape 325, Side A. The commentary remained the same thereafter.

■    Ordinarily, a committee's inaction or failure to adopt a proposed amendment, as distinct from its affirmative act, is insufficient to permit an inference about its intent. Three things are important here, however. First, the version of OEC 504 contained in HB 2030, which became law, differs in a material way from *proposed* FRE 504, on which it was modeled. We generally give meaning to the difference between an Oregon statute and the statute or model code from which it was borrowed. *See State v. Dyson,* 292 Or 26, 32-34, 636 P2d 961 (1981) (giving effect to difference between wording of model code and wording of statute); *cf. Fifth Ave. Corp. v. Washington Co.,* 282 Or 591, 597-98, 581 P2d 50 (1978) (in amending statute, material change in wording is presumed to intend change in meaning). The history that we have recounted demonstrates that the legislative committees were conscious of that difference. Accordingly, it is particularly appropriate that we give effect to the deletion of references to "drug addiction." Second, the commentary to OEC 504 was prepared at the time of the hearings on HB 2030. The history that we have described illuminates the circumstances of its preparation and shows that the substantive committees were aware of the proposed commentary. Third, the substantive committees were made aware of the policy choice that the Interim Committee had made, which differed from the recommendation of the Advisory Committee.

■    To summarize, although we are not bound by the commentary, *State v. McClure,* 298 Or 336, 344, 692 P2d 579 (1984), in this instance, it accurately reflects the intent of the

legislative committees to exclude from the definition of psychotherapist a person consulted specifically for drug dependency, OEC 504(1)(c), notwithstanding the person's credentials. Because of the context of the section's history, we conclude that the legislative committees intended to exclude drug dependency from "mental or emotional condition[s]" under *both* OEC 504(2) *and* OEC 504(1)(c).[5] Logic dictates the same result as legislative history. OEC 504 defines both privileged "communications" and "psychotherapists" by reference to the purpose of the consultation — the "*diagnosis or treatment*" of a "*mental or emotional condition.*" OEC 504(1)(c) and (2). It would make no sense to exclude drug dependency from the scope of "mental or emotional condition[s]" in one subsection but not the other. We hold that the psychotherapist-patient privilege does not apply to communications made during the diagnosis or treatment of drug dependency when that is the specific purpose of the diagnosis or treatment.[6]

Mother points out the policy considerations that, in her view, justify an opposite conclusion. Whatever may be the merit of her position, we are not free to disregard the rule as we believe it was intended to be read.

In this case, mother consulted the two therapists specifically for treatment of her drug dependency. Accordingly, their testimony and the drug treatment records are not privileged under OEC 504, and it was error to exclude that evidence. We next must decide what disposition is appropriate in the light of that error.

Mother argues that, even if the privilege does not apply, excluding the evidence was harmless error. She cites OEC 103(1), which provides:

---

[5] The version of the Oregon Evidence Code, HB 2030, that went to the floor in 1981 included OEC 504 without the phrases on "drug addiction" that had appeared in the Advisory Committee's original proposal. There was no specific discussion of OEC 504 in the floor debates before its enactment. House Committee on the Judiciary, July 11, 1981, Tape 28; Tape Recording, Senate Justice Committee, August 1, 2, 1981, Tape 237.

[6] Confidential communications about drug dependency that are made during the course of, and are an integral part of, diagnosis or treatment of a mental or emotional condition that is covered by the privilege, are privileged.

"Evidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."

She argues that, to warrant reversal, there must be a substantial likelihood that the error affected the outcome of the proceeding in the trial court and that the disputed evidence would not have had that effect.

■      Mother's reliance on a harmless error analysis under OEC 103(1) is misplaced, and the Court of Appeals erred in deciding the case on that basis. In a proceeding to terminate parental rights, the Court of Appeals is *required* to review the record *de novo*.[7] ORS 19.125(3). That is, it must make its own decision about the facts,[8] not simply analyze the trial court's findings to determine whether improperly excluded evidence would have influenced the trial court. In making its decision, the Court of Appeals must consider the excluded evidence that should have been admitted. Remand to the trial court is not an appropriate disposition, unless the proponent of the excluded evidence was precluded from making a complete offer of proof. *Cf. State v. Olmstead,* 310 Or 455, 461, 800 P2d 277 (1990) (offer of proof was not required where it would have been futile). That is not the situation here.

The state's offer of proof covered three files concerning mother's drug counseling, but only very limited testimony. With respect to one of mother's drug counselors, the state established his credentials, identified and offered his file, and said:

"I don't plan on making an offer of proof with testimony from [the drug counselor,] since his file has been offered. And, if on review, someone disagrees with the trial court, they can get, I think, any evidence from that file."

The offer of proof concerning the other drug counselor consisted only of asking him where he worked, what his job was, and

---

[7] In contrast, this court is not required to review the record *de novo*. "When the Court of Appeals has tried a cause anew upon the record, the Supreme Court may limit its review of the decision of the Court of Appeals to questions of law." ORS 19.125(4).

[8] We do not mean to suggest that the Court of Appeals must make written findings of fact.

whether he had a waiver from mother to discuss her treatment. The state also offered two additional drug treatment files, which the trial court sealed. Nothing in the record suggests that the proponent considered the offer of proof to be incomplete.

On this record, there is, therefore, no proper basis for the Court of Appeals' disposition of the case. We remand the case to the Court of Appeals for *de novo* review of the record and for a decision affirming or reversing the judgment of the circuit court.

The decision of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded to the Court of Appeals for further proceedings consistent with this opinion.

**UNIS, J.,** dissenting.

"[A]lmost any word or phrase may be rendered vague or ambiguous by dissection with a semantic scalpel.... But such an approach amounts to little more than verbal calisthenics." *Cole v. Richardson,* 405 US 676, 683-84, 92 S Ct 1332, 1337, 31 L Ed 2d 593, 602 (1972) (quoting *Cole v. Richardson,* 397 US 238, 240, 90 S Ct 1099, 25 L Ed 2d 275 (1970) (Harlan, J., concurring in the result)). The majority's resolution of this case illustrates the truth of those statements.

With a semantic scalpel, the majority, ignoring the plain, natural, ordinary, and common sense meaning of the phrase "mental or emotional condition" unnecessarily dissects that phrase and implants a perceived legislative intent to hold that treatment for drug or alcohol dependence is not treatment for a "mental or emotional condition." The majority concludes, therefore, that "the psychotherapist-patient privilege does not apply to [confidential] communications made [by a person to his or her psychotherapist] during diagnosis or treatment of drug dependency when that is the specific purpose of the diagnosis or treatment." 312 Or at 180.[1]

---

[1] The terms "drug dependency," "drug addiction," and "chemical dependency" are used interchangeably throughout this dissent.

I am unwilling to participate in the majority's verbal calisthenics. I strongly disagree with the majority's holding. Because I find that the psychotherapist-patient privilege applies in this case, but that mother waived the privilege, I would reverse the decision of the Court of Appeals and remand this case to the trial court for further proceedings.

## I. THE PSYCHOTHERAPIST-PATIENT PRIVILEGE

In analyzing the psychotherapist-patient privilege in OEC 504, it is helpful to break it down into its basic components: (1) A patient[2] in a professional relationship with (2) a psychotherapist[3] in the course of which (3) a confidential communication[4] passes (4) which was *germane, i.e.,* "made for the purpose of diagnosis or treatment of the patient's mental or emotional condition," OEC 504(2), and (5) the privilege is claimed by the "holder" or other authorized claimant.[5] Once those elements are established, the

---

[2] OEC 504(1)(b) defines "patient" as "a person who consults or is examined or interviewed by a psychotherapist."

[3] OEC 504(1)(c) provides:

" 'Psychotherapist' means a person who·is:

"(A) Licensed, registered, certified or otherwise authorized under the laws of any state to engage in the diagnosis or treatment of a mental or emotional condition; or

"(B) Reasonably believed by the patient so to be, while so engaged."

[4] OEC 504(1)(a) defines a "confidential communication" as one "not intended to be disclosed to third persons." Under OEC 504(1)(a), a communication between the psychotherapist and the patient retains the requisite confidentiality despite its disclosure to third persons if those persons are "present to further the interest of the patient in the consultation, examination or interview," "reasonably necessary for the transmission of the communication," or "participating in the diagnosis and treatment under the direction of the psychotherapist, including members of the patient's family."

[5] OEC 504(3) provides:

"The privilege created by this section may be claimed by:

"(a) The patient.

"(b) A guardian or conservator of the patient.

"(c) The personal representative of a deceased patient.

"(d) The person who was the psychotherapist, but only on behalf of the patient. The psychotherapist's authority so to do is presumed in the absence of evidence to the contrary."

communication is privileged unless the proponent of the evidence can show either that (6) an exception to the privilege applies,[6] or that (7) the privilege has been waived.[7]

In this case, the majority holds that the privilege does not apply because the patient (mother) has failed to show that element (4), germaneness, exists, *i.e.,* that the communication was made for the purpose of diagnosis or treatment of the patient's mental or emotional condition. I disagree.

---

[6] OEC 504(4) provides:

"The following is a nonexclusive list of limits on the privilege granted by this section:

"(a) If the judge orders an examination of the mental, physical or emotional condition of the patient, communications made in the course thereof are not privileged under this section with respect to the particular purpose for which the examination is ordered unless the judge orders otherwise.

"(b) There is no privilege under this rule as to communications relevant to an issue of the mental or emotional condition of the patient:

"(A) In any proceeding in which the patient relies upon the condition as an element of the patient's claim or defense; or

"(B) After the patient's death, in any proceeding in which any party relies upon the condition as an element of the party's claim or defense.

"(c) Except as provided in ORCP 44, there is no privilege under this section for communications made in the course of mental examination performed under ORCP 44.

"(d) There is no privilege under this section with regard to any confidential communication or record of such confidential communication that would otherwise be privileged under this section when the use of the communication or record is allowed specifically under ORS 426.070, 426.074, 426.075, 426.095, 426.120 or 426.307. This paragraph only applies to the use of the communication or record to the extent and for the purposes set forth in the described statute sections."

[7] OEC 511 provides:

"A person upon whom ORS 40.225 to 40.295 [OEC 503 to OEC 514] confer a privilege against disclosure of the confidential matter or communication waives the privilege if the person or the person's predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication. This section does not apply if the disclosure is itself a privileged communication. Voluntary disclosure does not occur with the mere commencement of litigation or, in the case of a deposition taken for the purpose of perpetuating testimony, until the offering of the deposition as evidence. Voluntary disclosure does occur, as to psychotherapists in the case of a mental or emotional condition and physicians in the case of a physical condition upon the holder's offering of any person as a witness who testifies as to the condition."

## II. STATUTORY LANGUAGE

The foundation on which the majority rests its entire analysis is that the phrase "mental or emotional condition," as contained in OEC 504, is ambiguous. That foundation is flawed. The house of cards that the majority erects on that foundation, therefore, collapses.

The majority states:

> "The phrase 'mental or emotional condition' neither unambiguously excludes nor unambiguously includes drug dependency. 'Mental or emotional condition' may mean quite different things to a psychiatrist, a psychologist, an internist, a research physician, a social worker, a patient, a member of the clergy, a legislator, and a judge. * * * The intent of the legislature is not clear from the terms and context of the statute. We turn, therefore, to legislative history."

312 Or at 174-75.

Thus, this case is about the meaning of the phrase "mental or emotional condition" in OEC 504. In construing a statute, the task of this court is to discern the intent of the legislature. ORS 174.010; *Mattiza v. Foster*, 311 Or 1, 4, 803 P2d 723 (1991). The best evidence of legislative intent is the statute itself.[8] Stated slightly differently, there is no more persuasive evidence of the purpose of a statute than the words used by the legislature to express its wishes. *Whipple v. Howser*, 291 Or 475, 480, 632 P2d 782 (1981); *State ex rel Cox v. Wilson*, 277 Or 747, 750, 562 P2d 172 (1977).

The inquiry into legislative intent, therefore, begins with an examination of the language of the statute itself. Words of common usage in a statute are to be given their plain, natural, and ordinary meaning. *Perez v. State Farm Mutual Ins. Co.*, 289 Or 295, 299, 613 P2d 32 (1980) (citing *Blalock v. City of Portland*, 206 Or 74, 80, 291 P2d 218 (1955)). Only "[w]hen the language of the statute does not provide sufficient insight into the legislative intent [is it] appropriate to consider legislative history." *Mattiza v. Foster, supra*, 311 Or at 4. Therefore, when the language of the

---

[8] "The singly [sic] most important rule of statutory interpretation * * * is, the statute itself usually contains answers to most questions of how it should be applied." Newman & Surrey, Legislation 645 (Prentice-Hall 1955).

statute provides sufficient insight into legislative intent, it is *not* appropriate to consider legislative history.

In the context of the issue presented in this case, the language of OEC 504 provides sufficient insight into legislative intent. The phrase "mental or emotional condition" in OEC 504 has a plain, natural, and ordinary meaning; it has reference to the patient's mental or emotional well-being. Under OEC 504, treatment is for a "mental or emotional condition" *if the treatment is related to the patient's mental or emotional well-being.*[9]

When a person seeks professional help from a psychotherapist for drug dependence, can there be any serious question that the person is seeking professional *mental health* assistance? Of course not![10] If the person did not seek mental health assistance, the person would not intentionally consult a psychotherapist, who, by definition, provides diagnosis or treatment of a mental or emotional condition. *See*

---

[9] *See* Wright & Graham, 25 Federal Practice and Procedure: Evidence 183-84, § 5525 (suggesting that the phrase "mental or emotional condition" in the proposed, but rejected, FRE 504, from which OEC 504 is derived, has a similar meaning).

[10]

"Psychotherapy is a method of treating *emotional* problems by means of a supportive working relationship between the therapist and the patient. In the sanctuary of the therapist's office, the patient is encouraged to feel comfortable while discussing his or her problems and conflicts and optimistic that he or she can be helped. The therapist may interpret the problems and suggest different ways to cope with them.

"There are dozens of different kinds of therapy. Basically, however, there are two categories.

"In one category are the psychodynamic therapies. These are designed to help [the patient] understand better the psychological forces that motivate [the patient's] actions, with the goal that these insights reveal possibilities for change. Psychoanalysis is a well-known example of this kind of therapy * * *.

"In the second category are the behavior therapies which, as the name implies, deal not with inner feelings and motivations but instead use specific techniques to change specific behavioral symptoms. Therapy to create a dislike for smoking is an example of behavior therapy.

"[Psychotherapy can help the patient] learn to cope more effectively with [his or her] priorities and responses to stress, and to understand and accept [himself or herself] as [he or she is].

"In practice, *most therapies involve a mixture of self-exploration by the patient and supportive-directive work from the therapist.* Psychodynamic therapy may be one-on-one between therapist and patient, or it may be in a group setting." (Emphasis added.)

Mayo Clinic Family Health Book 1026 (1990).

OEC 504(1)(c). To suggest otherwise is like saying "elephants are camels" or "white means black." As one evidence treatise states: "Those reared in the age of 'The Man With The Golden Arm'[11] will be pardoned for supposing that 'addiction' refers to a physical dependency." Wright & Graham, 25 Federal Practice and Procedure 185, § 5525.[12]

The legislature itself has explicitly recognized that a drug-dependent person[13] may be "psychologically" ill. *See* ORS 430.306(7), 430.405(1), and 430.450(9) (defining "drug-dependent person");[14] ORS 430.315 and 430.415 (recognizing drug dependency as an illness).

The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-III-R), widely accepted in the United States as the common language of mental health clinicians and researchers, categorizes substance use as a mental disorder. Diagnostic and Statistical Manual of Mental Disorders 165 (3d ed 1987).

Because the language of OEC 504 provides a clear insight into the legislature's intent as to the meaning of the phrase "mental or emotional condition," it is inappropriate to consider legislative history. *See Mattiza v. Foster, supra,*

---

[11] A 1956 film about a professional card dealer (with plans to become a jazz drummer) who finally kicks his drug habit.

[12] "Addiction" means a "[p]hysical or *emotional* (or both) dependence on a substance (most often alcohol or another drug), usually requiring increasing amounts." Mayo Clinic Family Health Book, *supra,* at 1314.

[13] A "drug-dependent person" is defined identically in ORS 430.306(7), 430.405(1) and 430.450(9), except the word "personal" does not appear in ORS 430.405(1).

" 'Drug-dependent person' means one who has lost the ability to control the personal use of controlled substances or other substances with abuse potential, or who uses such substances or controlled substances to the extent that the health of the person or that of others is substantially impaired or endangered or the social or economic function of the person is substantially disrupted. *A drug-dependent person may be physically dependent,* a condition in which the body requires a continuing supply of a drug or controlled substance to avoid characteristic withdrawal symptoms, *or psychologically dependent,* a condition characterized by an overwhelming *mental* desire for continued use of a drug or controlled substance." (Emphasis added.)

[14] The legislature also recognizes in these statutes that a drug-dependent person may be physically ill or psychologically ill. Nevertheless, if a drug-dependent person consults a psychotherapist, that person is seeking mental or emotional assistance.

311 Or at 4. The majority, of course, recognizes this limitation on considering legislative history, or it would not have gone to such lengths to try to initially establish that an ambiguity exists. ORS 174.010 directs this court, in construing a statute, "simply to ascertain and declare what is, in terms or in substance, contained therein, *not to insert what has been omitted, or to omit what has been inserted * * *.*" (Emphasis added.) .

### III. LEGISLATIVE HISTORY

The majority asserts that "[t]he drafters of *proposed* FRE 504[, upon which OEC 504 is based,] expressly included the words 'drug addiction' in apparent recognition of the ambiguity of the general phrase, 'mental or emotional condition.' " 312 Or at 174 n 4 (emphasis in original). The majority is wrong! Rather, the specific inclusion of the words "drug addiction" in proposed, but rejected, FRE 504 was recognition by the drafters of a *special need to encourage* drug addicts to avail themselves of needed treatment. The drafters believed that drug addicts might not avail themselves of needed treatment if they fear communications may be used against them. The language "drug addiction" was inserted as *an assurance of confidentiality,* not because the drafters believed the phrase "mental or emotional condition" was ambiguous.[15]

It was for that same reason, recognition of a special need to encourage drug addicts to seek needed treatment by providing an assurance of confidentiality, that the Advisory Committee on the Oregon Evidence Code (Advisory Committee) specifically included "drug addiction" in its proposed

---

[15]

"The specific inclusion of communications for the diagnosis and treatment of drug addiction recognizes the continuing contemporary concern with rehabilitation of drug dependent persons and is designed to implement that policy by *encouraging persons in need thereof to seek assistance.* The provision is in harmony with Congressional actions in this area. See 42 U.S.C. § 260, providing for voluntary hospitalization of addicts or persons with drug dependence problems and prohibiting use of evidence of admission or treatment in any proceeding against him, and 42 U.S.C. § 3419 providing that in voluntary or involuntary commitment of addicts the results of any hearing, examination, test, or procedure used to determine addiction shall not be used against the patient in any criminal proceeding." (Emphasis added.)

Federal Advisory Committee Note to Subdivisions (b) and (c) of proposed, but rejected, FRE 504. Louisell and Mueller, 2 Federal Evidence 1155 (rev ed 1985).

version of OEC 504. It was *not* because the Advisory Committee believed that the phrase "mental or emotional condition" is ambiguous. As the majority states: "The Advisory Committee[]* * * included drug addiction to encourage drug-dependent persons to seek assistance." 312 Or at 175 (citing Proposed Oregon Evidence Code Report, Interim committee on the Judiciary, December 1980, p 78).

Despite the fact that the language of OEC 504 provides sufficient insight into legislative intent as to the meaning of the phrase "mental or emotional condition," the majority considers legislative history. In so doing, the majority, based on a vague legislative history, rewrites the definition of both the word "psychotherapist," OEC 504(1)(c), and the "germaneness" requirement of the privilege, OEC 504(2), to give effect to what the majority perceives to be the legislative intent. The majority entertains a three-step analysis parallel to the following progression:

(1) Initial language: fruit, including peaches.

(2) Final language: fruit.

(3) Legislative intent: fruit, excluding peaches.

That result defies common sense. A peach is no less a fruit when it is not specifically listed than when it is. Drug addiction is no less a mental or emotional condition (even if it has a physical component) when it is not specifically listed than when it is. Nevertheless, as rewritten and augmented by the majority, OEC 504(1)(c) reads:

" 'Psychotherapist' means a person who is:

"(A) Licensed, registered, certified or otherwise authorized under the laws of any state to engage in the diagnosis or treatment of a mental or emotional condition, *excluding drug addiction;* or

"(B) Reasonably believed by the patient so to be, while so engaged."

OEC 504(2), as rewritten by the majority, reads:

"A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purposes of diagnosis or treatment of the patient's mental or emotional condition, *excluding*

*drug addiction,* among the patient, the patient's psychotherapist or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family."

The italicized language represents the language added by the majority to give effect to what the majority perceives to be the legislative intent.

Assuming, *arguendo,* some ambiguity in OEC 504 that permits resort to legislative history, the legislative history relied on by the majority is vague[16] and does not support the majority's conclusion that the legislature intended to exclude drug dependency from "mental or emotional condition[s]" under both OEC 504(2) and OEC 504(1)(c). 312 Or at 179-80. The proposed Oregon Evidence Code was submitted to the 1981 Legislative Assembly as House Bill 2030. House Bill 2030 included OEC 504, without any reference to drug addiction. Neither the House Committee on the Judiciary nor the Senate Justice Committee, which discussed OEC 504, took any *affirmative action* to exclude drug dependency from "mental or emotional condition[s]" in either OEC 504(1)(c) or OEC 504(2). Moreover, there was no specific discussion of OEC 504 in the deliberations on the floor before enactment. As this court has stated: "Legislative inaction is a weak reed upon which to lean in determining legislative intent." *Berry v. Branner,* 245 Or 307, 311, 421 P2d 996 (1966).

The majority relies on the commentary to OEC 504 to support its conclusion. However:

"It must be remembered that the commentary is not an official part of the Oregon Evidence Code and was not approved by the entire legislature. Of course, it provides highly useful background regarding each rule and guidance to courts and attorneys in interpreting those rules, but *the commentary is not controlling upon this or any other court.*" (Emphasis added.)

*State v. McClure,* 298 Or 336, 344, 692 P2d 579 (1984). *See also State v. Campbell,* 299 Or 633, 653, 705 P2d 694 (1985) (Campbell, J., dissenting) (in interpreting OEC 803(18a), the hearsay exception for complaint of sexual misconduct, the

---

[16] It is a dangerous thing to infer from the statements of one or two the intention of the entire Legislative Assembly.

court ignored the commentary to that rule).[17] In this instance, the commentary does not accurately reflect the intent of the legislature as to the meaning of the statutory phrase "mental or emotional condition."

Assuming, *arguendo,* that legislative history indicates that the legislature intended to exclude drug addiction from "mental or emotional condition[s]" under both OEC 504(1)(c) and OEC 504(2), the legislature failed to translate that intent into *operational* language. In *Monaco v. U.S. Fidelity & Guar.,* 275 Or 183, 188, 550 P2d 422 (1976), this court stated:

> "Whatever the legislative history of an act may indicate, it is for the legislature to translate its intent into *operational language.* This court cannot correct clear and unambiguous language for the legislature so as to better serve what the court feels was, or should have been, the legislature's intent. *Lane County v. Heintz Construction Co. et al,* 228 Or 152, 157, 364 P2d 627 (1961)." (Emphasis added.)

The function of the court is to interpret the law, not to make it. *See Foster v. Goss,* 180 Or 405, 408, 168 P2d 589, 175 P2d 794 (1947) ("the court has no legislative powers and is not authorized to supply deficiencies in a statute").[18]

Moreover, no matter what legislative history indicates, this court may not rewrite a statute to give effect to a perceived legislative intent not supported by the words of the statute. *See Portland Adventist Medical Center v. Sheffield,* 303 Or 197, 200, 735 P2d 371 (1987) (courts are not at liberty to fill in perceived legislative omissions); *State ex rel Everding v. Simon,* 20 Or 365, 373-74, 26 P 170 (1891) (where the legislature has omitted by mistake or otherwise to make the necessary provisions to carry out its intention, the court cannot by construction supply those provisions).

---

[17] In several cases, this court has found the commentary useful in determining the effect and scope of a particular rule in the Oregon Evidence Code. *See, e.g., State v. Carlson,* 311 Or 201, 211, 808 P2d 1002 (1991); *John Deere v. Epstein,* 307 Or 348, 355, 769 P2d 766 (1989); *Powers v. Officer Cheeley,* 307 Or 585, 592, 771 P2d 622 (1989).

[18] *See also Whipple v. Howser,* 291 Or 475, 480, 632 P2d 782 (1981) (this court is *"not at liberty to give effect to any supposed intention or meaning in the legislature, unless the words to be imported into the statute are, in substance at least, contained in it"* (quoting cases) (emphasis in original)).

## IV. STATUTORY CONSTRUCTION

Just as it is appropriate to consult legislative history when the statutory language is ambiguous, it is appropriate to apply rules and maxims of statutory construction when legislative history is ambiguous.[19] Therefore, assuming, *arguendo,* that the phrase "mental or emotional condition" is ambiguous, and resort to legislative history is appropriate, but that the legislative history is itself vague, a statute should not be construed "so as to ascribe to the legislature the intent to produce an unreasonable or absurd result." *State v. Linthwaite,* 295 Or 162, 170, 665 P2d 863 (1983). According to the majority, the psychotherapist-patient privilege "does not apply to communications made during diagnosis or treatment of drug dependency when that is the specific purpose of the diagnosis or treatment." 312 Or at 180. The majority states, however, that the privilege would apply to "[c]onfidential communications about drug dependency that are made during the course of, and are an integral part of, diagnosis or treatment of a mental or emotional condition that is covered by the privilege * * *." 312 Or at 180 n 6. The line between the two situations is fine and frequently unclear. Such a distinction is artificial, unworkable, and very difficult to administer.

The majority apparently holds that if a person seeks mental health assistance from a psychotherapist for low self-esteem, hopelessness, inappropriate display of emotions, low frustration tolerance, or aggressiveness (*i.e.,* for *symptoms* of drug dependency[20]), the privilege would apply to confidential communications about drug dependency. If, however, a person seeks mental health assistance from a psychotherapist specifically for *drug addiction,* and that person is experiencing one or more of the aforementioned signs or symptoms which are commonly associated with drug dependency, the privilege would not apply. The way the person characterizes the request, *i.e.,* as for assistance for the *condition of drug*

---

[19] In other words, if the statute is clear, our inquiry is complete, even if the result is unreasonable or absurd. If the statute is ambiguous, we consider legislative history. If legislative history is clear, our inquiry is complete, even if the result is unreasonable or absurd. If legislative history is ambiguous, we may resort to rules or maxims of statutory construction, *e.g.,* that the legislature did not intend an unreasonable or absurd result.

[20] *See* Mayo Clinic Family Health Book, *supra,* at 1046-49.

*dependence* versus as for assistance for the *symptoms of drug dependence,* will determine whether the privilege applies. The label is the key, rather than any real difference in the treatment or condition. This is an unreasonable and absurd result.

Further, under the majority's analysis, apparently the type of drug condition involved will determine whether the privilege applies. The majority excludes from the privilege only communications made in treatment for drug dependence. As dissected by the majority, the privilege apparently will cover confidential communications in treatment for drug use and drug abuse, as distinguished from drug addiction. Those conditions are not synonymous. For example, the legislature distinguishes "drug abuse" and "drug-dependent person." ORS 430.405(2) provides:

> " 'Drug abuse' means repetitive, excessive use of drugs or controlled substances short of dependence, without legal or medical supervision, which may have a detrimental effect on the individual or society."

For the definition of "drug-dependent person," *see* ORS 430.405, *supra,* note 13. The applicability of the privilege to confidential communication about controlled substances, therefore, will depend on whether the condition is drug use (privilege applies), drug abuse (privilege applies), or drug dependence (no privilege), even though for all three conditions the person seeks assistance from the psychotherapist for a mental or emotional condition.

The majority's dissection of that statutory phrase to implant a perceived legislative intent that is neither supported by the language of the statute nor by a vague legislative history is unjustified and improper and undermines the purpose of the privilege. The theory underlying the psychotherapist-patient privilege is that people should be encouraged to seek professional help without fear that whatever information they disclose later will be used against them. *State v. Miller,* 300 Or 203, 208, 709 P2d 225 (1985) ("[t]he purpose of this privilege is to foster a relationship that is deemed important to society and one whose success is dependent upon full and free communication"). The majority's construction of the "mental or emotional condition" limitation on the scope of the privilege undermines that policy; it

dissuades drug-dependent persons from seeking needed professional mental health treatment, because confidentiality, a *sine qua non* for successful treatment, will be no longer protected.[21] Given the social costs of all forms of chemical dependency and the "war on drugs" in which our nation is engaged, I fear that the majority's opinion can only have immeasurable and detrimental effects on the lives of countless individuals and on society in general.

In summary, in the context of the issue presented in this case, the unambiguous statutory language "mental or emotional condition" manifests the correct interpretation and is, therefore, controlling. That language is the best evidence of legislative intent. Because the statutory language is clear, it is inappropriate to consider legislative history. Even if legislative history is considered, that legislative history is not clear, and we should not interpret the statute to produce an unreasonable or absurd result when a more reasonable interpretation is available and, in my opinion, more consistent with legislative history.

## V. APPLICATION OF PRIVILEGE IN THIS CASE

I would hold that the psychotherapist-patient privilege applies to confidential communications made by a person to that person's psychotherapist during diagnosis or treatment for drug dependency even when that is the specific purpose of the diagnosis or treatment. In this case, I would hold, therefore, that the confidential communications made by mother to her psychotherapists for the specific purpose of diagnosis and treatment of her drug dependency, and the advice given to mother by her psychotherapists relevant to that mental or emotional condition, are privileged under OEC 504, unless those communications in question fall within an exception to the privilege, *see* OEC 504(4)(b),[22] or the privilege has been waived.[23]

---

[21] As one commentator noted, addicts will not avail themselves of treatment or rehabilitation facilities if they fear consequent detection and prosecution when their communications are used against them. Whitford, *The Physician, the Law, and the Drug Abuser,* 119 U Pa L Rev 933, 943-44 (1971).

[22] *See supra,* note 6.

[23] *See supra,* note 7.

Here, the state contends that the communications in question fall within the so-called "patient-litigant" exception, OEC 504(4)(b)(A),[24] and, therefore, are not privileged. Additionally, the state asserts that mother waived any psychotherapist-patient privilege she may have had.

Frances Howard was the first witness to testify in the hearing on termination of parental rights.[25] Howard, who has a master's degree in counseling and guidance, was a counselor and an assistant chaplain in the "Prison Ministry for Women" program at the correctional facility where mother had resided. On direct examination, Howard testified that mother had asked her for advice concerning an "environment where she [mother] could go that * * * would help her with her problem with drugs." Howard further testified on direct examination that she had recommended a particular drug program to mother and that mother expressed an interest in participating in that program. On cross-examination, after Howard appeared reluctant to testify and stated, "I guess I don't know right here where confidentiality starts and ends[,]" mother's lawyer interjected:

"Could we have a moment, your Honor? I am going to consult with my client about this.

"I just want to let the witness know, your Honor, that [mother] is not retaining any confidentiality basis and that Ms. Howard is free to testify as to what her recollections are. So I'm a little bit concerned that the witness might be concerned about breaching confidentiality of [mother's] confidences to her. And [mother] just informed me that she is not claiming any privilege in regard to this witness."

Howard testified, without objection, that mother had indicated her drug of choice, but could not remember what that drug was. Howard also disclosed other communications that

---

[24] The "patient-litigant" exception in OEC 504(4)(b)(A) prevents the patient from relying on a mental or emotional condition as an element of the patient's claim or defense and then asserting the privilege to prevent an opponent from obtaining evidence that might rebut the patient's claim. For a detailed discussion of the "patient-litigant" exception, *see* Wright and Graham, *supra,* at § 5543.

[25] Howard was called out of order to testify on behalf of mother. The record does not indicate why Howard was permitted to testify as the first witness in the proceeding.

mother had made to her, which were relevant to mother's mental or emotional condition of drug dependency.[26]

OEC 511 provides:

''A person upon whom [OEC 504] confer[s] a [psychotherapist-patient] privilege against disclosure of the confidential matter or communication waives the privilege if the person * * * voluntarily discloses or consents to disclosure of any significant part of the matter or communication [unless] * * * the disclosure is itself a privileged communication. * * * Voluntary disclosure does occur, as to psychotherapists in the case of a mental or emotional condition * * * upon the holder's offering of any person as a witness who testifies as to the condition.''

Mother offered the testimony of her counselor, Howard, and even ''consented to disclosure''[27] of any confidential communications made by mother to Howard relevant to mother's mental or emotional condition of drug dependency. Under OEC 511, ''offering of any person as a witness who testifies as to the [mother's mental or emotional] condition'' of drug dependency waives the privilege as to *all* communications relevant to that condition, even though such communications were made at other times and to other psychotherapists.[28] Once confidentiality is destroyed by

---

[26] For example, Howard testified that mother said that she had made some poor parenting choices, such as ''putting herself and her desires for the drugs ahead of the children.''

[27] ''Consent to disclosure'' is manifested by any statement or by other conduct of the holder of the privilege indicating consent to disclosure, including failure to claim the privilege in any proceeding in which the holder has the legal standing and a reasonable opportunity to claim the privilege. *See* West's Calif. Ann. Evid. Code § 912(a), from which my definition of ''consent to disclosure'' is derived. *See also* OEC 512 (''Evidence of a statement or other disclosure of privileged matter is not admissible against the holder of the privilege if the disclosure was * * * (2) [m]ade *without opportunity to claim the privilege*'').

[28] Under OEC 511:

''A person, merely by disclosing a subject which the person has discussed with an attorney or spouse or doctor, does not waive the applicable privilege; the person must disclose part of the communication itself in order to effect a waiver. As McCormick points out:

'' 'By the prevailing view, which seems correct, the mere voluntary taking the stand and testifying to facts which were the subject of consultation with counsel is no waiver of the privilege for secrecy of the communications to [one's] lawyer. It is the communication which is privileged, not the facts.' McCormick § 93.

waiver, no subsequent claim of privilege can restore it.[29]

Mother, therefore, waived the psychotherapist-patient privilege that she had concerning her mental or emotional condition of drug dependency. Accordingly, it is not necessary that I address the merits of the state's assertion of the "patient-litigant" exception.[30]

In sum, I would hold that the confidential communications made by mother to her psychotherapists even for the specific purpose of diagnosis and treatment of her drug dependency, and the advice given to mother by her psychotherapists relevant to that mental or emotional condition, are privileged under OEC 504, but that in this case the privilege was waived. Therefore, I would reverse the decision of the Court of Appeals and remand this case to the trial court for further proceedings not inconsistent with this dissenting opinion.

Van Hoomissen and Fadeley, JJ., join in this dissenting opinion.

---

"The one exception to the foregoing principle is contained in the final sentence of the rule. Where the holder of a privilege offers any person as a witness who testifies on the subject of the holder's physical, mental or emotional condition, *all* privileges that might protect communications on that subject between the holder and * * * psychotherapist * * * are waived." (Emphasis in original.)

Legislative Commentary to Oregon Evidence Code 106 (1986).

[29] It is not necessary to decide whether mother waived the privilege in other ways.

[30] OEC 504(4)(b)(B) provides that there is no psychotherapist-patient privilege "as to communications relevant to an issue of the mental or emotional condition of the patient" if the issue has been tendered by the patient, *i.e.,* when the patient "relies upon the condition as an element of the [patient's] claim or defense[,]" and the communications are relevant to that condition.

Normally, a patient "relies upon" her condition as an "element of her defense" only when she raises an affirmative defense, not when she denies an allegation in the complaint concerning her condition. In this case, the state alleged in its petition to terminate mother's parental rights, *inter alia,* that mother is unfit by reason of her drug addiction. In her response to the state's petition, mother denied that allegation. I need not address how, if at all, these principles apply in this case.